NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0051n.06

Case No. 20-5577

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jan 27, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| DANIEL J. ZULAWSKI, | ) | |
| Defendant-Appellant. | ) | |
| | ) | O P I N I O N |

Before: GUY, COLE, and STRANCH, Circuit Judges.

COLE, Circuit Judge. Defendant Daniel Zulawski was convicted for attempted enticement of a minor under 18 U.S.C. § 2422(b) after he arranged to have sex with an undercover agent posing as a "taboo mom" and her two fictitious minor children during a sting operation conducted in January 2018. He raises five issues on appeal, including whether the district court improperly denied his request for a *Franks* hearing and his motion to suppress, erroneously admitted inappropriate character evidence, and incorrectly applied an obstruction of justice enhancement to his sentence. Finding no error, we affirm.

## I. BACKGROUND

### A. Factual Background

In January 2018, Sergeant Zulawski left his post at Fort Campbell to attend a week-long pre-deployment training in Lexington, Kentucky. Though preoccupied with training and other

activities with his fellow soldiers most of the day, Zulawski spent his evenings at a hotel using his Google Pixel cell phone to solicit sexual encounters online.

On January 15, 2018, Detective Heather D'Hondt with the Kentucky Attorney General's office posted an advertisement on Craigslist under the heading "[t]aboo/incest mom in Lex for 2 days only[.]" (PSR, R. 141, PageID 1856.) D'Hondt's advertisement described her as a 30-year-old divorced "mom" "[l]ookin for serious inquires" to engage in "taboo/incest" with her and her "two guests." (*Id.* at PageID 1856, 1858–70.) Zulawski responded to the advertisement, claiming that he "[a]bsolutely love[d] incest" and "always had an interest in seeing it or experiencing it for real." (*Id.* at PageID 1857.) D'Hondt replied to his message the next day. She clarified that her "two guests" were her 11-year-old daughter and 13-year-old son. She then initiated a conversation with Zulawski on the instant messenger application, Kik.

D'Hondt and Zulawski discussed meeting for sex. When D'Hondt reiterated that she intended to bring her children with her, he said "[t]hat sounds like it would be hot =)" and asked if she felt "comfortable sending pics." (*Id.* at PageID 1859.) D'Hondt replied "I can send selfies, [but] I don't do nudes till I meet." (*Id.*) She sent pictures of herself and the children—who, unbeknownst to Zulawski, were also law enforcement officials—and Zulawski complimented the family, calling her "absolutely gorgeous" and the children "[a]dorable." (*Id.* at PageID 1859–60.) The two discussed their "hard limits" for sexual activity, and Zulawski eventually asked "what/how/where would you like to do this." (*Id.* at PageID 1860.)

Though Zulawski offered to host the family in his hotel room, D'Hondt requested they meet at a neutral location instead. She asked Zulawski to clarify whether he was "wanting all of us" or "just certain ones," to which Zulawski replied that he "[f]igure[d] you and me could watch them go at it while we play and then me and ur son use you both[.]" (*Id.* at PageID 1861.)

Zulawski wrote that he was "pretty excited for this" and asked whether the "[k]ids [were] as excited as we are." (*Id.* at PageID 1863.) D'Hondt confirmed that they were, especially her son. Zulawski asked how the children came to be involved in taboo sexual activity. She told him "[s]ince 4 and 6." (*Id.* at PageID 1864.) He responded "Awesome =)[.]" (*Id.*) She then asked Zulawski: "So you're serious. Not wasting my time?" (*Id.*) Zulawski replied he was "[d]ead serious" and he had "never found a taboo family before," confessing he had "always wanted to find one to watch and play with." (*Id.* at PageID 1865.) He described their planned encounter as "a dream come true =)[.]" (*Id.*) They agreed to meet on January 17, 2018.

The day of their intended rendezvous, Zulawski and D'Hondt discussed how excited they were for that evening. Zulawski confirmed that they were "definitely" still on and he "[couldn't] wait" to meet. (*Id.* at PageID 1867–68.) The two also discussed logistics, including the 11-year-old's latex allergy and the location of their meeting. Before Zulawski began the roughly 30-minute drive to Frankfort, Kentucky, D'Hondt warned him to "[b]e careful" driving due to the wintery weather. (*Id.* at PageID 1869.) Zulawski arrived at the arranged hotel just before 7 p.m.

Zulawski was arrested just outside of the hotel room where he was supposed to meet D'Hondt and her children. Officers seized the phone Zulawski used "to do all [his] talking, texting, and emailing"—the Google Pixel—and retained it for examination. (*Id.* at PageID 1873–74.)

When asked why he had come to Frankfort, Zulawski initially said that he was responding to an advertisement for "a mother who had . . . sexual relations with her child, with her children" and it "interest[ed] [him] a little bit." (*Id.* at PageID 1873.) But then, his story changed. He claimed that he had previously helped children "that ha[d] been subjected to" "stuff like this" when he worked as an EMT. (*Id.* at PageID 1873–74.) According to Zulawski, he hoped to "talk some sense into the mother" after "build[ing] some rapport." (*Id.* at PageID 1874–75.) Zulawski then

told the officers he had a wife, a 9-year-old stepdaughter, and a 2-year-old daughter. The next day, D'Hondt asked Christian County's Department of Community Based Services to check in on Zulawski's children. Because Zulawski was currently on active duty, D'Hondt also notified the Army of Zulawski's arrest.

After D'Hondt called, the Army's Criminal Investigative Division went to Zulawski's residence at Fort Campbell to investigate. Zulawski's wife then gave investigators permission to search their home. During the consent search, investigators noticed a cell phone in a locked cage in the garage. Zulawski's wife claimed it was her husband's phone and he had it on him before leaving for Lexington. They then sought, obtained, and executed a warrant from a military magistrate to search and seize the "cage phone."

Once law enforcement officials decided to prosecute Zulawski in civilian courts, Army investigators surrendered the cage phone to individuals in the Kentucky Attorney General's office. As an additional precaution, the Attorney General's office also sought a warrant from a state magistrate in Franklin County to search the phone's contents and the contents of 12 other electronic devices found in Zulawski's home. To support probable cause, D'Hondt swore an affidavit detailing: (1) the events leading up to Zulawski's arrest; (2) the Army's seizure of the cage phone; and (3) her communications with the Christian County Department of Community Based Services, which had advised her that Zulawski's 9-year-old stepdaughter had recently told authorities he had sexually abused her. Specifically, Zulawski's stepdaughter told officials that Zulawski made her lie on a bed naked and then used his cell phone to photograph himself touching her "no no square." (Mot. to Suppress (Attorney General Warrant), R. 31-5, PageID 555.) She also accused Zulawski of taking a photograph of her while she was unclothed after a shower.

The Franklin County magistrate authorized the search of the electronics and their contents. The Attorney General's office conducted a forensic search of the cage phone, obtaining a series of sexually explicit chats between an anonymous user and several other individuals claiming to be minors.

Zulawski was indicted on state charges in Franklin County Circuit Court five days after his arrest. Officials dismissed those charges in May 2018, after the United States Attorney's Office for the Eastern District of Kentucky charged him under 18 U.S.C. § 2422(b) for attempting to entice a minor to engage in unlawful sexual activity. Zulawski pleaded not guilty.

### B. Procedural History

Before trial, Zulawski moved to suppress the evidence obtained from the cage phone by attacking the probable cause foundation of both warrants. As to the Army warrant, Zulawski principally argued that the warrant contained an intentionally false statement: namely, that he told his mother that "any evidence against him would be found on his old cellular devices." (Mot. to Suppress, R. 31, PageID 259–60 (quoting Mot. to Suppress (Army Warrant), R. 31-5, PageID 545).) He claimed that inaccuracy merited a *Franks* hearing and the warrant was void for lack of probable cause. He then argued that the deficiencies in the Army warrant doomed the Attorney General warrant because the latter relied on the former. He also contended that the Attorney General warrant lacked a sufficient nexus between the alleged criminal conduct and the cage phone, so it plainly lacked probable cause.

After the parties presented witnesses and arguments at a hearing, the magistrate judge recommended that the district court deny Zulawski's motion to suppress. *See United States v. Zulawski*, No. 3:18-CR-005-GFVT-MAS, 2019 WL 7594181, at *8 (E.D. Ky. Aug. 26, 2019). The magistrate judge also recommended denying Zulawski a *Franks* hearing because he failed to

demonstrate that the statement paraphrasing his jail phone call to his mother was intentionally or even recklessly misleading. *Id.* at *4–5. Instead, the magistrate judge reasoned that "[t]he various law enforcement officers in this case ended up in a proverbial game of 'telephone' wherein the exact wording of Zulawski's statements to his mother was lost." *Id.* at *4. The magistrate judge then concluded that the Attorney General warrant was supported by probable cause because the stepdaughter's allegations—coupled with the underlying crime—supported searching the cage phone for evidence. *Id.* at *5–6. The district court largely adopted the magistrate judge's recommendations over Zulawski's objections, denying his motions to suppress and his request for a *Franks* hearing. *See United States v. Zulawski*, No. 3:18-CR-005-GFVT-MAS, 2019 WL 5388524, at *4–5 (E.D. Ky. Oct. 22, 2019).

After the district court denied his suppression motion, Zulawski filed numerous objections to the government's evidence in the run-up to trial, including a motion in limine to exclude the sexually explicit text messages from the cage phone. Zulawski argued these conversations were inadmissible because they were hearsay, improper res gestae evidence, and impermissible character evidence. The government opposed, and the district court granted the motion in part, limiting the introduction of the cage phone text messages to "just that section that addresses the age" of the purportedly underage users. (Trial Tr. Day 1, R. 159, PageID 2795–97.) The court also allowed the government to put the sexual nature of the conversations "into context." (*Id.*)

Before trial, the government also advised Zulawski that it intended to admit eight text chats from Zulawski's Pixel phone into evidence. For the most part, these conversations occurred during Zulawski's time in Lexington and showed his attempts to schedule sexual encounters with strangers while there. Zulawski raised no objection to the introduction of these messages before or during trial.

At trial, Zulawski testified in his own defense and claimed he was not a party to the cage phone conversations. But after a three-day trial and four hours of deliberation, the jury returned a guilty verdict. Less than two weeks later, Zulawski moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. After "[w]eighing the evidence in favor of the prosecution," the district court held a reasonable juror could conclude that Zulawski committed the charged crime beyond a reasonable doubt. (Mot. for J. of Acquittal Or., R. 108, PageID 1164–66.)

As Zulawski's case proceeded to sentencing, the presentence investigation report ("PSR") ultimately recommended a two-point sentence enhancement for obstruction of justice based on Zulawski's testimony that he did not send the text messages on the cage phone. Zulawski objected to the enhancement, arguing that there was insufficient evidence to support that he knew he was testifying falsely. But the district court concluded that the government had shown by at least a preponderance of the evidence that Zulawski was the one texting from the cage phone, and consequently, the obstruction enhancement was justified. The court adopted the PSR without modification.

Although the court's sentencing calculation rendered a range of 292 to 365 months, it reduced Zulawski's sentence to 192 months in light of Zulawski's age, military service, and non-violent status. "A significant period of incarceration is required due to the harm to the community," the court wrote, but "[i]ncarceration is not necessary to protect the public." (PSR, R. 142-1, PageID 1919.) Rather, "[t]he defendant needs help[,] and resources will be provided to him while incarcerated and while on supervised release." (*Id.*) Zulawski appealed.

## II. ANALYSIS

On appeal, Zulawski asks this court to vacate his conviction and remand for further proceedings for four reasons. First, he argues the district court erred when it denied his request for a *Franks* hearing and his motion to suppress the contents of the cage phone. He claims that he made the showing required to merit a *Franks* hearing and he attacks both warrants' probable cause. Next, he asserts that the lower court erred by admitting the cell phone evidence from the cage and Pixel phones under Rule 404(b), Rule 403, and other rules of evidence. He contends that the cumulative effect of these errors violated his due process right to a fair trial, so he requests a new one. He also argues that the district court erred by denying his motion for judgment of acquittal because there was insufficient evidence of his intent. And finally, even if his conviction withstands scrutiny, he requests we remand for resentencing because the district court improperly applied an obstruction of justice enhancement to his sentence. We consider each in turn.

### A. Motion to Suppress/Franks Hearing

We review a "district court's denial of a *Franks* hearing under the same standard as for the denial of a motion to suppress: the district court's factual findings are reviewed for clear error and its conclusions of law are reviewed de novo." *United States v. Bateman*, 945 F.3d 997, 1007 (6th Cir. 2019) (internal quotations and citations omitted).

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend IV. Generally, searches that occur pursuant to a valid warrant are per se reasonable. *United States v. Crawford*, 943 F.3d 297, 305 (6th Cir. 2019). "For a warrant to be validly issued, however, it must have been based on 'probable cause' justifying the search." *Id.* (citation omitted). Probable cause requires "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Normally, affidavits explaining the basis for probable cause are afforded "a presumption of validity." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). But if probable cause is predicated on intentionally false information, it invalidates the warrant and a court can suppress the evidence gleaned from its execution through a *Franks* hearing. *Crawford*, 943 F.3d at 309. "A defendant is entitled to a *Franks* hearing if he: 1) makes a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit; and 2) proves that the false statement or material omission is necessary to the probable cause finding in the affidavit." *United States v. Young*, 847 F.3d 328, 348–49 (6th Cir. 2017) (internal quotations and citation omitted). "This substantial showing is necessary because a challenge to the veracity of the search warrant affidavit must overcome the presumption that the affidavit is valid." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 648 (6th Cir. 2003).

Zulawski challenges the validity of both the Army warrant and the Attorney General warrant. Much like he did below, he argues he made a sufficient showing that the Army warrant's probable cause was based entirely on an intentionally misleading paraphrase of a conversation between him and his mother following his arrest. Consequently, he claims the district court erred by denying his request for a *Franks* hearing. Along the same vein, he argues the Attorney General warrant lacked sufficient probable cause because his 9-year-old stepdaughter's allegations of sexual abuse against him were too unreliable and they lacked a sufficient nexus to the charged crime in any event. Accordingly, the evidence obtained from that search—specifically the contents of the cage phone—should have been suppressed. We disagree with Zulawski on both fronts.

### 1. *Franks Hearing Denial*

First, the district court properly concluded Zulawski was not entitled to a *Franks* hearing because he failed to make a substantial showing that the Army warrant contained statements made with intentional or reckless disregard for the truth. The Army warrant included (1) details from the underlying investigation, including that Zulawski was suspected of "communicat[ing] via his mobile device that he 'wanted sex' with an 11 and 13 (y/o) son and daughter"; (2) information from Zulawski's wife, specifically her acknowledgment that the cage phone was "one of [Zulawski's] old cellular phones" and he had it "on him before leaving"; and (3) a statement paraphrasing a phone call between Zulawski and his mother after his arrest that "SGT Zulawski told his mother that any evidence against him would be found on his old cellular phones." (Mot. to Suppress (Army Warrant), R. 31-5, PageID 545.)

The magistrate judge concluded—and the district court agreed—that Zulawski made a preliminary showing sufficient to satisfy *Franks*' second prong because "Zulawski's statement about the 'evidence' on old cellular phones clearly supported the probable cause to issue the [Army] Search Warrant." *Zulawski*, 2019 WL 7594181, at *3; *see Zulawski*, 2019 WL 5388524, at *2–3. The government does not contest that determination on appeal. Assuming without deciding that was correct, the only question before us then is whether Zulawski made a substantial showing that the Army warrant contained statements made with intentional or reckless disregard for the truth. *Young*, 847 F.3d at 348–49. To do so, he must "point to specific false statements" and "accompany his allegations with an offer of proof." *United States v. Cummins*, 912 F.2d 98, 101 (6th Cir. 1990) (internal quotations and citation omitted). Even then, it is insufficient to show that some of the information contained in the search warrant is false. *Rodriguez-Suazo*, 346 F.3d at 648. Rather, the defendant must show by a preponderance of the evidence that the affiant

"*intentionally* or *recklessly* misrepresented facts in order to secure the search warrant." *Id.* (emphasis added).

Zulawski failed to carry his burden here. True, the statement in the affidavit was "not a precise recitation of his statements on the jail calls." *Zulawski*, 2019 WL 7594181, at *4, *adopted in relevant part by* 2019 WL 5388524, at *3. It did, however, "capture[ ] the essence of Zulawski's statement[s]." *Zulawski*, 2019 WL 7594181, at *4 *adopted in relevant part by* 2019 WL 5388524, at *3.

As the lower court stressed, there were "several law enforcement agencies, military and civilian," involved in this investigation. *Zulawski*, 2019 WL 7594181, at *4 *adopted in relevant part by* 2019 WL 5388524, at *3. At the suppression hearing, a Franklin County Regional Jail investigator testified that he called D'Hondt after listening to conversations between Zulawski and his mother. The investigator told D'Hondt that Zulawski had expressed concern about investigators finding an old cellular phone, a laptop, and unregistered weapons in his home. After the investigator called her, D'Hondt testified that she phoned her Army contacts and told them "there would be devices at his home that had evidence possibly." (Suppression Hr'g Tr., R. 52, PageID 369.) Ultimately, that became "SGT Zulawski told his mother that any evidence against him would be found on his old cellular phones." (Mot. to Suppress (Army Warrant), R. 31-5, PageID 545.)

Zulawski also argues that call logs show D'Hondt was listening to his phone calls contemporaneously, so any oversimplification on her end was reckless at the very least. But even if D'Hondt had listened to the phone calls contemporaneously, that does not show or prove that the paraphrased statements of the jail calls were misleading or untrue. Rather, it is consistent with the reality that warrant affidavits "'are normally drafted by nonlawyers in the midst and haste of a

criminal investigation.'" *United States v. Brooks*, 594 F.3d 488, 490 (6th Cir. 2010) (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)). For this reason, although an affidavit's "sloppiness may raise flags," it is normally not "fatal" to the warrant itself. *Id.* Because Zulawski failed to produce evidence that D'Hondt "intentionally or recklessly misrepresented facts in order to secure the search warrant," the district court correctly denied his request for a *Franks* hearing. *See Rodriguez-Suazo*, 346 F.3d at 648. And, even if the statement was intentionally or recklessly misleading, the subsequent Attorney General warrant resolved any concerns with the Army warrant.

### 2. *The Attorney General Warrant*

Zulawski also contests the probable cause foundation of the Attorney General warrant, acquired after the authorities involved determined that Zulawski would be prosecuted through civilian courts. The warrant requested authorization to seize 13 electronic devices—including the cage phone—and search the contents of each. Probable cause for this warrant relied in part on Zulawski's stepdaughter's claim that he had sexually abused her. In his suppression motion, Zulawski argued that this warrant was invalid because his stepdaughter's allegations were not sufficiently credible to support probable cause, and even if they were, they lacked a sufficient nexus to the sting operation to support a search of the cage phone. Again, we disagree.

Zulawski principally relies on *Wesley v. Campbell*, 779 F.3d 421 (6th Cir. 2015), to suggest his stepdaughter's history of behavioral issues rendered her unreliable and her allegations against him suspect. In *Wesley*, we addressed whether the plaintiff's complaint "stated a claim for false arrest" under Federal Rule of Civil Procedure 12(b)(6). *Id.* at 429–30. Accepting the plaintiff's allegations as true, we concluded that a counselor's arrest for the sexual assault of a 7-year-old student 84 days after the allegations were made was without probable cause because the student's

allegations were unreliable for reasons that became apparent in the weeks after the accusations were made. 779 F.3d at 424–26, 430. These reasons alleged in the complaint included the fact that the place where the abuse allegedly occurred was "within the line of sight of other adult staff members" at the school, the student's medical examination "showed no evidence consistent with his allegations of sexual abuse," and the officer's own investigation "failed to uncover any evidence corroborating any aspect of the abuse [he] alleged." *Id.* at 430.

Zulawski's argument, however, fails to appreciate the significant differences between that case and the facts presented here. For one thing, Zulawski's stepdaughter alleged that he photographed her in private, rather than a public-facing office. *Cf. Wesley*, 779 F.3d at 424–25. For another, the aftereffects of the conduct alleged—taking photographs of himself inappropriately touching her while she laid on the bed unclothed—would not have been evident through a medical examination. *Cf. id.* at 430. And even then, the warrant here was to support a search of Zulawski's devices—not his arrest, as in *Wesley*—because he was already in custody. As we recently explained, "[t]he probable-cause standard applies differently in different contexts." *United States v. Baker*, 976 F.3d 636, 645 (6th Cir. 2020). "The test for an arrest asks whether there is a reasonable ground for belief of guilt specific to the suspect." *Id.* (internal quotations and citation omitted). The probable cause standard for *searches*, though, requires courts to ask "whether a nexus exists between a crime and the place to be searched and whether information in an affidavit is sufficiently timely to think that the sought-after evidence still remains at the identified location." *Id.* at 645–46 (internal quotations and citation omitted).

That brings us to Zulawski's second argument: that his stepdaughter's allegations lacked a sufficient nexus to the sting operation to support a search of the cage phone. It fares no better than the first. As Zulawski notes, for probable cause to exist, there must be "a nexus between the place

to be searched and the evidence sought." *United States v. Rose*, 714 F.3d 362, 366 (6th Cir. 2013). To establish that nexus, "there must be reasonable cause to believe that the items sought are located on" (or within) the item to be searched. *Id.*

Zulawski argues that because the sting operation produced no evidence that he viewed or created child pornography, there was no nexus between it and his stepdaughter's allegations. What he fails to appreciate, however, is that the warrant was not specifically limited to the sting operation. Rather, it sought to search and seize 13 specifically named electronic devices that could "tend[] to show that a crime has been committed." (Mot. to Suppress (Attorney General Warrant), R. 31-5, PageID 554.) Because his stepdaughter's allegations were sufficiently credible, the affidavit included evidence that Zulawski had committed another crime: producing child pornography with an electronic device. Consequently, the officers had sufficient probable cause to search Zulawski's phone. *See United States v. Neuhard*, 770 F. App'x 251, 253 (6th Cir. 2019) *cert. denied*, 140 S. Ct. 570 (2019).

Since both warrants were properly supported by probable cause, we affirm the district court's denial of Zulawski's request for a *Franks* hearing and his motion to suppress.

**B. Admissibility of the Cage Phone Chats**

After his motion to suppress was denied but before trial began, Zulawski objected to the admission of the contents of the cage phone. The district court granted the motion in part, mostly limiting the conversations to the individuals' ages. On appeal, Zulawski argues that this was an error because the cage phone chats should have been excluded in full under Rule 404(b) and Rule 403 of the Federal Rules of Evidence. Because Zulawski objected to the admission of this evidence at trial, we review the district court's decision to introduce it under three different standards of review: "(1) for clear error the district court's determination that the other act took place; (2) de

novo for the district court's legal determination that the evidence was admissible for a proper purpose; and (3) for an abuse of discretion the district court's determination that the probative value of the other acts evidence is not substantially outweighed by its unfairly prejudicial effect." *United States v. Emmons*, 8 F.4th 454, 473 (6th Cir. 2021) (internal modifications, quotations, and citation omitted). "The decision to admit relevant but potentially unfairly prejudicial evidence is a nuanced one traditionally committed to 'the sound discretion of the trial court.'" *United States v. France*, 611 F. App'x 847, 850 (6th Cir. 2015) (quoting *United States v. Zipkin*, 729 F.2d 384, 389 (6th Cir. 1984)).

Zulawski mounts both procedural and substantive attacks on the district court's decision to admit the cage phone chats. Procedurally, he argues the district court erred by not making an explicit finding that Zulawski was a party to the cage phone conversations. Substantively, Zulawski contends the cage phone chats were not probative of any permissible evidentiary purpose under Rule 404(b) and, in any event, their prejudicial effect substantially outweighed their probative value under Rule 403. Neither argument carries the day.

The relevant inquiry is "whether 'there is sufficient evidence to support a finding by the jury that the defendant committed the similar act.'" *United States v. Yu Qin*, 688 F.3d 257, 262 (6th Cir. 2012) (quoting *Huddleston v. United States*, 485 U.S. 681, 685 (1988)). And here, there was. The district court admitted the cage phone chats only after it had spent a significant amount of time reviewing them. Even before trial, the district court contemplated the admissibility of these chats through a motion to suppress and a motion in limine. The court had the benefit of full briefing on the issues and a magistrate judge conducted a hearing—with witnesses—on the cage phone's contents. The district court's exhaustive contemplation of the admissibility of the cage phone chats

gives rise to the inference that the district court found he was a party to the conversations, even if it did not explicitly say so. *See United States v. Lattner*, 385 F.3d 947, 956 (6th Cir. 2004).

Zulawski's substantive objections fare no better. The government introduced the cage phone texts to demonstrate Zulawski's interest in pursuing sexual relations with minors and his intent to entice D'Hondt's children to engage in unlawful sexual conduct with him the night of the sting operation. Assuming for the purposes of argument that he was a party to the chats, Zulawski argues that they were not probative of his intent for two reasons. First, he notes that the age of consent in Kentucky is 16. Because § 2422(b)'s language reaches only conduct that would be unlawful under the law of the state where it would have occurred, conversations between him and anyone over 16 would not be probative. Second, he contends that the cage phone chats were neither substantially similar to the charged crime nor reasonably near in time because they did not involve an adult intermediary and they occurred 14- to 16-months before his arrest.

As to Zulawski's first argument, the district court correctly noted that the probative value here does not turn on whether the anonymous users were *actually* underage—what matters is that Zulawski *believed* them to be, and yet continued to pursue them. Other courts have confirmed that evidence like this is admissible in § 2422(b) cases to show "intent, or lack of mistake, in arranging sex with a minor," even when the communication involved is separate from the charged conduct. *United States v. Cooke*, 675 F.3d 1153, 1157 (8th Cir. 2012) (concluding a sexually explicit email chain between the defendant and a purportedly 16-year-old Craigslist user was admissible under Rule 404(b) to show intent to entice a 13- and 15-year-old); *see also United States v. Harmon*, 593 F. App'x 455, 460 (6th Cir. 2014) (holding defendant's claims that he had previously engaged in sexual acts with minors were admissible under Rule 404(b) to show state of mind). The

statements' truth was insignificant—only the evidence of the perpetrator's intent was. *Harmon*, 593 F. App'x at 460.

It is irrelevant, moreover, whether the government proved that the prior conversations occurred or were unlawful under the law of a particular jurisdiction. *See Huddleston v. United States*, 485 U.S. 681, 686–89 (1988) (holding that Rule 404(b) does not require "a preliminary finding by the trial court that the act in question occurred"). Indeed, other courts have determined technically lawful conversations with individuals under 18 are still probative of a defendant's intent to engage in sexual activity with those even younger. *See*, *e.g.*, *United States v. Dhingra*, 371 F.3d 557, 566 (9th Cir. 2004) (reasoning defendant's prior communications with a 17-year-old were "highly probative" of his intent to engage in sex with a 13-year-old, notwithstanding the fact that "it was legal to engage in sexual activity with a 17-year-old" in New Mexico).

Zulawski's second argument—that the chats were neither substantially similar nor reasonably near in time to be probative—is equally unpersuasive. He suggests that because the cage phone chats involved no adult intermediaries and contained only generalized discussions of sexual activity with no concrete plans to meet, they lack a substantial similarity to the charged crime. But we have repeatedly held that "there is no requirement that the prior act must be identical in every detail to the charged offense." *United States v. LaVictor*, 848 F.3d 428, 447 (6th Cir. 2017) (internal quotations and citation omitted). Instead, the prior acts need only be "part of the same scheme or involve a similar *modus operandi* as the present offense." *Emmons*, 8 F.4th at 475 (internal modification, quotations, and citation omitted). In each of the cage phone chats, Zulawski is flirtatious, unfailingly persistent (and flexible), and extremely complimentary of the other after he initiates a photo exchange. The parallels between the cage phone chats and the conversation with D'Hondt are substantially similar.

Finally, Zulawski's argument that the time between the cage phone chats and his arrest renders the cage phone conversations less probative is not supported by case law. Under our precedent, "there is no absolute maximum number of years that may separate a prior act and the offense charged." *LaVictor*, 848 F.3d at 447 (internal quotations and citation omitted). Indeed, the 16-month span between the start of cage phone chats and Zulawski's arrest is quite near in time comparatively. *See, e.g.*, *Emmons*, 8 F.4th at 476 (uncharged conduct in 2011 was "reasonably near in time" to 2014 offense); *United States v. Hardy*, 643 F.3d 143, 152 (6th Cir. 2011) (observing this court has previously allowed four-year-old prior act evidence). Again, Zulawski's arguments come up short.

That leaves the Rule 403 balancing. To be admissible under Rule 404(b), the probative value of the cage phone chats cannot be substantially outweighed by its potentially prejudicial effect. Again, the district court retains "very broad discretion" in making this determination and we "take[] a maximal view of the probative effect of the evidence and a minimal view of its unfairly prejudicial effect," meaning we "will hold that the district court erred only if the latter outweighs the former." *United States v. Libbey-Tipton*, 948 F.3d 694, 701 (6th Cir. 2020) (internal quotations and citations omitted).

Zulawski argues that the portions of the cage phone conversations admitted were unnecessarily lurid and inflammatory and could have influenced the jury to convict him because they disapproved of sexually explicit conversations or because he was unfaithful to his wife. And—for the first time—he also argues the court's limiting instruction to the jury was insufficiently particularized. Here, however, the district court spent a considerable amount of time considering whether to admit the contents of the cage phone. When it did, the district court ordered the government to redact irrelevant portions—and even then, it double-checked that the

government complied with its order. The district court used its broad discretion to admit the evidence, but only for the relevant, permissible purpose it identified.

Additionally, the district court reinforced the evidence's limited use just before deliberations, when it instructed the jury to consider the cage phone texts only for Zulawski's "intent or motive, preparation, plan, knowledge, or identity." (Trial Tr. Day 3, R. 158, PageID 2649.) Together, the district court and the parties considered the court's pattern language for Rule 404(b) jury instructions and eliminated the irrelevant purposes (such as opportunity, absence of mistake, or absence of accident). At that point, Zulawski was amenable to the instruction provided. Though he now argues the court's jury instruction was improper because it did not sufficiently focus the jury's attention on the disputed issue, Zulawski cannot establish plain error because "[o]ne use listed by the jury instructions"—intent—"was actually at issue," which "compel[s] the conclusion that the district court did not commit plain error." *United States v. Newsom*, 452 F.3d 593, 606 (6th Cir. 2006). The cage phone chats were properly admitted under Rule 404(b).

## C. Admitting Evidence from the Pixel Phone

For the first time on appeal, Zulawski argues that the Pixel phone chats also should have been excluded from trial. He argues the chats (1) do not qualify as res gestae; (2) are not probative of a material non-character issue under Rule 404(b); and (3) carry prejudicial effects that substantially outweigh their probative value. He also argues the Pixel phone's browser history was erroneously admitted, although again, he did not object to its admission at trial. Because Zulawski raised no objection below, we review the admission of both pieces of evidence for plain error. *United States v. Cromer*, 389 F.3d 662, 672 (6th Cir. 2004). To establish plain error, Zulawski must show "(1) error (2) that was obvious or clear, (3) that affected defendant's

substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Wallace*, 597 F.3d 794, 802 (6th Cir. 2010). This, he cannot do.

At the top, Zulawski argues that the Pixel phone chats are neither res gestae evidence nor probative of any permissible non-character purpose. He also contends their admission was procedurally deficient because the district court failed to make the necessary findings to introduce the evidence for one of those purposes, though he cites no case law in support of that contention. The evidence need only be admissible as either res gestae or under Rule 404(b) for the district court's decision to survive his challenge—either one is sufficient to merit its introduction. *See, e.g.*, *Emmons*, 8 F.4th at 473–74; *United States v. Ramer*, 883 F.3d 659, 671 n.1 (6th Cir. 2018) ("Because we conclude that the evidence was admissible under Rule 404(b), we need not examine its admissibility as *res gestae*."). But even if the evidence is admissible, however, it must be properly admitted under Rule 403. *See United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015).

Res gestae evidence—also known as background evidence or intrinsic evidence—is admissible "in limited circumstances" at trial "when the evidence includes conduct that is 'inextricably intertwined' with the charged offense." *Id.* (citation omitted). The evidence must have a "causal, temporal, or spatial connection with the charged offense." *Id.* (citation omitted). This tends to include evidence that "is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of the witness's testimony, or completes the story of the charged offense." *Id.* (internal quotations and citations omitted). The Pixel chats' close temporal and spatial proximity is undisputed. Consequently, the parties mainly contest whether the Pixel chats sufficiently relate to the charged offense or whether they have any other probative value.

Zulawski argues the Pixel chats are not a "prelude" to the § 2422(b) charge because they purportedly transpired between consenting adults. His argument, however, is both speculative and immaterial. Much like the cage phone chats, none of the users' ages were verified. But even more to the point, the lawfulness of the underlying conduct does not matter because "even unindicted activity can be 'inextricably intertwined' with the actual charges." *Churn*, 800 F.3d at 779.

As we have observed, "[t]he jury is entitled to know the setting of a case. It cannot be expected to make its decision in a void–without knowledge of the time, place and circumstances of the acts which form the basis of the charge." *United States v. Vincent*, 681 F.2d 462, 465 (6th Cir. 1982) (internal quotations and citation omitted). With that in mind, these chats served to complete the story behind Zulawski's charged offense in several ways. For one thing, the timing (and explicit content) of Zulawski's messages suggest he was singularly focused on finding sexual partners, rather than planning a rescue mission (as he claims). As the government highlights, Zulawski's messages show he was flirting with another stranger within minutes of the point when he claims to have figured out that D'Hondt was abusing her children, requiring his intervention. For another, Zulawski's discussions with others about the winter weather and severe road conditions highlight what a significant step it was for him to then drive twenty-seven miles to meet the family for sex. Because we conclude the evidence was admissible under res gestae, we need not consider whether it was admissible under 404(b). *Emmons*, 8 F.4th at 473–74.

Finally, the evidence was properly introduced under Rule 403. *See Churn*, 800 F.3d at 779. The conversations admitted—lurid as they may be—all pertain to Zulawski's intent to engage in sexual acts. Thus, they carry "legitimate probative force" to the charge of attempted enticement under § 2422. *Newsom*, 452 F.3d at 604 (citation omitted). Consequently, they do not surmount the "high standard of review" reserved for reversing a district court's Rule 403 calculation. *Id.*;

*see also United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018) (noting "[t]he test is strongly weighted toward admission").

For the foregoing reasons, the district court did not err by introducing any of the contested evidence. Consequently, Zulawski's request to remand for a new trial under the cumulative error doctrine falls flat because "[w]here . . . no individual ruling has been shown to be erroneous, there is no 'error' to consider, and the cumulative error doctrine does not warrant reversal." *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012).

### D. Sufficiency of the Evidence

Following trial, Zulawski moved for judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that the government failed to prove Zulawski intended to entice the minors to engage in unlawful sexual acts. We review the denial of a motion for judgment of acquittal de novo. *United States v. Howard*, 947 F.3d 936, 947 (6th Cir. 2020). The question before the court is "whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citation omitted). The jury's verdict receives "the benefit of all inferences which can reasonably [be] drawn from the evidence, even if the evidence is circumstantial." *United States v. Rozin*, 664 F.3d 1052, 1058 (6th Cir. 2012) (citation omitted). The defendant bears the "very heavy burden," *United States v. Sease*, 659 F.3d 519, 523 (6th Cir. 2011) (internal quotations and citation omitted), of convincing us that the judgment against him "is not supported by substantial and competent evidence upon the record as a whole." *United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005) (citation omitted).

Zulawski was convicted of one count of attempting to entice a minor to engage in unlawful sexual activity under 18 U.S.C. § 2422(b). "To convict a defendant under § 2422(b), the government must show that the defendant (1) 'use[d] the mail or any facility or means of interstate

or foreign commerce'; (2) to 'knowingly persuade[ ], induce[ ], entice[ ], or coerce[ ]' or 'attempt[ ] to' persuade, induce, entice or coerce; (3) a person who the defendant believed to be under the age of eighteen; (4) 'to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense.'" *United States v. Vinton*, 946 F.3d 847, 852 (6th Cir. 2020) (citations omitted, alterations in original). Because Zulawski is charged with attempt, the government must show that he "intended to persuade or entice a minor to participate in unlawful sexual conduct" and "took a substantial step toward persuading or enticing a minor." *Id*. (citation omitted).

Of the essential elements, Zulawski argues only that the second—the intent to entice or persuade—is lacking. Specifically, he argues that the evidence against him was insufficient because it demonstrated only his "intent to engage in sexual contact with minors, not the 'clearly separate and different intent[ ]' to persuade" them to do so. (Appellant Br. at 20 (quoting *United States v. Bailey*, 228 F.3d 637, 639 (6th Cir. 2000)).) He contends there were two main deficiencies in the prosecution's case: (1) a lack of evidence that he made any effort to use D'Hondt as an intermediary to gain the minor's assent and (2) no physical evidence that would suggest that he intended to persuade or entice the minors at the rendezvous. These arguments, however, find little support in our case law. In both *United States v. Roman*, 795 F.3d 511 (6th Cir. 2015) and *United States v. Vinton*, 946 F.3d 847 (6th Cir. 2020), we rejected a defendant's efforts to dismiss § 2422(b) indictments because we found that a defendant's communications with an adult intermediary could satisfy the statute's enticement requirement.

In *Roman*, the defendant posted an advertisement on Craigslist seeking to have sex with younger women. 795 F.3d at 513. A special agent responded, claiming to be a father who was sexually active with his 11-year-old daughter. *Id.* The two discussed the sexual acts the defendant

wished to perform with the minor and the defendant agreed to abide by any parameters her father set. *Id.* at 513–14. The defendant requested the minor's photograph, asked about the minor's sexual preferences, and asked what gifts he could bring with him to "break the ice." *Id.* at 514. When the defendant arrived at the meeting location with—among other things—the minor's favorite candy, he was arrested. *Id.*

We emphasized these facts when describing how the defendant satisfied § 2422(b)'s intent requirement. First, we explained the defendant's representations that he would be respectful of the minor and not cause her harm were designed to influence her father to help the defendant secure the minor's assent. *Id.* at 517–18. We then considered what steps the defendant took to secure the daughter's assent individually and found that the defendant's questions about her sexual and general preferences were also aimed at acquiring her assent. *Id.* at 518.

We built upon *Roman*'s foundation in *Vinton*. There, we reversed a district court's dismissal of a § 2422(b) indictment because we determined that the government could carry its burden on the intent requirement. *Vinton*, 946 F.3d at 849. Much like the instant case, the defendant corresponded with a purportedly 36-year-old mother about having sex with her and her 12-year-old daughter. *Id.* at 850. He asked in graphic detail about the sexual acts the daughter could and would perform and "suggested that the [mother] could help him be gentle with the girl and help him make sure the girl enjoyed the sexual encounter." *Id.* at 850–51, 855. Relying on *Roman*, the defendant asserted the indictment against him should be dismissed in part because he did not "use the adult intermediary"—in this case, the girl's mother—"as a messenger to convey the defendant's own enticing messages to the minor." *Id.* at 853.

We clarified that our decision in *Roman* does not require that a defendant use an adult intermediary as a messenger or that "the specific means of inducing or enticing the child must

come from the defendant himself." *Id.* Rather, it was sufficient for a defendant to "rel[y] on the expertise of the parent in determining how best to entice the child." *Id.* Ultimately, we stressed a reasonable juror could find that the defendant was "aware of the special influence of parents over their children" and intended to exploit it when the time came. *Id.* at 855. Accordingly, we reversed the dismissal of the indictment.

Although Zulawski's approach differed from both *Roman* and *Vinton* in material respects, the ultimate result is the same: a reasonable juror could find that he intended to rely on the expertise of the minors' mother to entice them into performing unlawful sexual activities. This saga began when Zulawski responded to an advertisement for "taboo/incest" with a 30-year-old divorced "*mom.*" (PSR, R. 141, PageID 1856 (emphasis added).) He knew at the outset that she was related to the children and was thus likely "aware of the special influence" she had over them. *Vinton*, 946 F.3d at 855. This suspicion was likely only bolstered by D'Hondt's startling admission that the children had been engaging in incest since they were four and six years old. Then, reminiscent of *Roman*, Zulawski claimed to be free from sexually transmitted diseases to put the mother's mind at ease. *See* 795 F.3d at 517. He also agreed to abide by the mother's terms, even though that meant driving 30 miles on icy roads to meet the family at a neutral location. *Id.* at 514. And perhaps most importantly, much like *Roman* and *Vinton*, Zulawski asked about the minors' sexual histories and whether they were "as excited" for the rendezvous as the adults purported to be. (PSR, R. 141, PageID 1863); *Vinton*, 946 F.3d at 850–51; *Roman*, 795 F.3d at 513–14. Under these facts, a rational factfinder could determine Zulawski possessed the requisite intent.

Zulawski's second argument—that lack of physical evidence undermines his intent—is also unsupported. Although we noted that a reasonable jury *could* have concluded that Vinton brought cash with him to the meeting to help convince the minor to engage in sexual acts with

him, we by no means placed dispositive weight on this fact. *See Vinton*, 946 F.3d at 854. We are not the only court to arrive at this conclusion. Indeed, *United States v. Nitschke*, 843 F. Supp. 2d 4 (D.D.C. 2011)—the same case that Zulawski holds out as bolstering his first argument—severely undercuts his second. Though not binding on this court, *Nitschke* stresses § 2422(b) criminalizes "an intent to persuade *using a means of interstate commerce*" rather than "an intent to persuade at some later point in person." 843 F. Supp. 2d at 11 (emphasis added). Though physical evidence can certainly support an individual's intent to persuade, its absence does not present a bar to proving intent.

After affording the government the benefit of all inferences that can be drawn from the record, we conclude a reasonable juror could have found Zulawski intended to use D'Hondt to gain the minors' assent. We affirm the district court's denial of Zulawski's motion for judgment of acquittal.

### E. Obstruction of Justice Sentence Enhancement

Finally, Zulawski argues that the district court improperly applied a two-level sentence enhancement for perjury because it did so without first finding that he falsely testified when he claimed he did not send the text messages on the cage phone. Although we have recently acknowledged that "[t]he precise standard of review for a district court's decision to impose the obstruction of justice enhancement is unclear," we need not resolve the dispute because Zulawski's challenge fails even under de novo review, the one most-favorable to him. *United States v. Bailey*, 973 F.3d 548, 572 (6th Cir. 2020) (citing *United States v. Thomas*, 933 F.3d 605, 608–10 (6th Cir. 2019)).

When a defendant has "willfully obstructed or impeded . . . the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," his Total Offense Level is increased by two. U.S.S.G. § 3C1.1. "[C]ommitting, suborning, or attempting to suborn perjury" constitutes obstruction of justice for the purposes of the enhancement. U.S.S.G. § 3C1.1 cmt. 4(b). The parties agree that the district court must "identify those particular portions of the defendant's testimony that it considers to be perjurious" and "make specific findings for each element of perjury" to support the enhancement's application. *United States v. Sassanelli*, 118 F.3d 495, 501 (6th Cir. 1997) (citation omitted). Zulawski contends the district court failed to do either.

At the outset, Zulawski argues that the district court's identification of his allegedly perjurious statements was too general, but his contention is not supported by the record. First, the PSR explicitly stated that Zulawski obstructed justice when he testified that "he did not send previous text messages from [the cage] phone." (PSR, R. 141, PageID 1843.) Then, at the sentencing hearing, the government clarified that the enhancement rose and fell on the same. During the hearing, the district court described in detail what it understood the government's basis for an enhancement to be:

> [W]ith regard to that phone, there were text messages sent from a designation of anon, A-N-O-N, as well as text messages there were sent from – and – well, the question with that particular phone is whether that was in fact the defendant or somebody else. And the evidence that the government put on were – was based on the content of those text messages, which the government argues ties your client to those text messages, in essence, and, of course, he's denied that that was him, and the government says that is a willful lie; that's perjury, and it's a matter that's material here to the jury making their determination. So I think I've framed the issue; is that fair?

(Sentencing Tr., R. 162, PageID 2940.)  All the parties agreed that this was correct.  Consistent with that mutual understanding, defense counsel highlighted the specific portions of testimony in question:

> Mr. Zulawski addressed [whether he was the sender of the text messages] head-on at trial. . . . His response was he had two potential people that had access to [the phone], as well as anybody else that was in the home. . . . So anybody that knew his code into his phone or knew his Kik app name [was] zulu828, and had a picture, presumably could go in there and do exactly these text messages, and that was the client's testimony.
>
> . . .
>
> [W]hat Mr. Zulawski testified is, it could have been Ms. Zulawski, very upset with the whole situation and text, and put these text messages on there. But again, that was his testimony.

(*Id.* at PageID 2947–48.)  And the court further specified the reason for the enhancement on the record:

> [T]he very specific fact [at issue] is, did he send these text messages or not? He knows whether he sent these text messages or not. And he may maintain that he didn't, but we have to kind of objectively look at it and determine whether or not his – you know, he's continuing to maintain that those text messages were his is in fact perjurious because the evidence shows that they could not have been someone else's.

(*Id.* at PageID 2943–44.)  After "consider[ing]" Zulawski's "testimony under oath" and the government's evidence, the district court concluded that the government had demonstrated "by at least a preponderance of the evidence that that was [Zulawski] texting" and applied the enhancement. (*Id.* at PageID 2950–51.)  Therefore, the record shows that the district court properly identified the perjurious portion of Zulawski's testimony for purposes of applying the enhancement. *See Sassanelli*, 118 F.3d at 501.

Zulawski's second argument—that the district court failed to make specific findings for each element of perjury—is also belied by the record.  "Perjury is (1) a false statement under oath

(2) concerning a material matter (3) with the willful intent to provide false testimony." *United States v. Kamper*, 748 F.3d 728, 747 (6th Cir. 2014) (citation and internal quotation marks omitted). As we have explained, in an ideal world, the district court would explicitly "explain[ ] why the facts satisfied each element of perjury." *United States v. Thomas*, 272 F. App'x 479, 488 (6th Cir. 2008). We have, however, previously affirmed on less "so long as the record below is sufficiently clear to indicate . . . that the district court found that those statements satisfied each element[.]" *Sassanelli*, 118 F.3d at 501. The district court stated that it must "find those elements here." (Sentencing Tr., R. 162, PageID 2950.) The portions of the transcript excerpted above confirm that the district court found that Zulawski willfully gave a false statement under oath. The only question remaining, then, is whether the court found that the statements were material.

The record supports that it did. The district court acknowledged it was the government's contention that the identity of the person responsible for the cage phone texts was "a matter that's material here to the jury making their determination." (Sentencing Tr., R. 162, PageID 2940.) And the government agreed, explaining at length that the cage phone texts had every potential to "crumble [Zulawski's] case" by severely undermining his rescue defense and convincing the jury of his true intent. (*Id.* at PageID 2944–47.) Ultimately, the court concluded that "given the strength of what the government has identified, both in their written filings and then in the argument here in court," the enhancement properly applied. (*Id.* at PageID 2951.)

We have never required district courts to "parrot" back the government's recitation of the relevant facts so long as the court "makes clear that it has independently adopted the government's version" of events. *Sassanelli*, 118 F.3d at 501. And we will not start here, although we remind district courts of our court's explicit preference for making specific findings on the record. *See United States v. Roberts*, 919 F.3d 980, 990 (6th Cir. 2019). Because the district court properly

identified the perjurious portions of Zulawski's testimony and found each element of perjury satisfied, we affirm the district court's obstruction of justice enhancement.

## III. CONCLUSION

We affirm the district court's judgments in full.